**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROSALYN A. HILEMAN, | : | CIVIL ACTION NO. 1:14-CV-1771 |
| | : | |
| **Plaintiff** | : | (Chief Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| PENELEC/FIRSTENERGY | : | |
| CORPORATION, | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Rosalyn A. Hileman ("Hileman") commenced this action against her former employer asserting claims of gender and race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.  (See Doc. 1).  Defendants seek summary judgment on each of Hileman's claims pursuant to Federal Rule of Civil Procedure 56.  (Doc. 29).

## I.  Factual Background & Procedural History[1]

Hileman began her employment with defendant Penelec ("Penelec") in 1982, when she was hired as a teller at its Lewistown, Pennsylvania facility.  (Doc. 30 ¶ 1;

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 30, 37).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

Doc. 37 ¶ 1).[2]  In 1986, Hileman transferred to Penelec's Huntingdon, Pennsylvania

location, where she assumed the role of "utility worker."  (Doc. 30 ¶ 3; Doc. 37 ¶ 3).

At all times relevant to this matter, Thomas Bolinger ("Bolinger") was Hileman's

direct supervisor.  (See Doc. 30 ¶ 4; Doc. 37 ¶ 4).

## A.    Hileman's Initial Employment

Hileman was a member of the Utility Workers Union of America Local 180

("the Local 180") throughout her tenure with Penelec.  (Doc. 30 ¶ 24; Doc. 37 ¶ 24).

A collective bargaining agreement negotiated between Penelec and the Local 180

governed employee pay rates.  (Doc. 30 ¶¶ 25-27; Doc. 37 ¶¶ 25-27).  In 1985, Penelec

and the Local 180 established the utility worker position by merging then-existing

crew clerk, operating clerk, and district storekeeper job descriptions.  (Doc. 30 ¶ 28;

Doc. 37 ¶ 28).  A memorandum of understanding executed between Penelec and the

Local 180 set compensation for employees hired to the new position at a lower rate

than those working as operating clerks.  (Doc. 30 ¶ 30; Doc. 37 ¶ 30; see also Doc. 31-

13).  Penelec planned to replace operating clerks with lower-paid utility workers as

operating clerks retired.  (Doc. 30 ¶ 31; Doc. 37 ¶ 31).

Hileman took objection to Penelec's practice in this regard.  Hileman

believed that Penelec should have posted a "hybrid" utility worker position upon

---

[2] Hileman's complaint identifies "Penelec/FirstEnergy Corporation" as a
single defendant.  (See Doc. 1 ¶ 2).  The Rule 56 record reveals that Penelec and
FirstEnergy Corporation are separate legal entities: Penelec is the trade name for
"Pennsylvania Electric Company," (Doc. 30 at 1 n.1), and FirstEnergy Corporation
is the parent holding company of Penelec, (id. ¶ 2).  We refer to the defendants as
"Penelec" and "FirstEnergy" herein.  This convention is stylistic in nature and shall
not be construed as accepting or rejecting Hileman's argument that both entities
are in fact a "single employer" for liability purposes.  (See Doc. 36 at 46-48).

each operating clerk's retirement, to be compensated at a rate higher than utility workers but lower than operating clerks. (Doc. 30 ¶ 32; Doc. 37 ¶¶ 31-32). Hileman alternatively believed that, at minimum, utility workers should be compensated at the operating clerk rate when performing operating clerk job duties. (Doc. 30 ¶ 33; see Doc. 37 ¶ 33). Hence, when an operating clerk at the Huntingdon facility retired in 2005, Hileman began modifying her timesheets to reflect a higher pay rate when performing the retired clerk's duties. (Doc. 30 ¶¶ 33, 35-36; Doc. 37 ¶¶ 33, 35-36). Hileman submitted these timesheets until approximately January of 2008, when management discovered her unauthorized practice and ordered her to stop unilaterally upgrading her pay rate. (Doc. 30 ¶ 37; Doc. 37 ¶ 37).

Hileman filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") on July 8, 2008, alleging that Penelec discriminated against her on the basis of race when it required her to reduce her pay to the utility worker rate for all work performed and failed to post the "hybrid position" she anticipated. (Doc. 30 ¶¶ 39-40; Doc. 37 ¶¶ 39-40). She dual-filed her complaint with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 31-15 ¶ 25; see also Doc. 30 ¶ 43; Doc. 37 ¶ 43). Hileman received right-to-sue letters from both agencies but did not file suit. (Doc. 30 ¶ 43; Doc. 37 ¶ 43).

On February 10, 2010, Hileman filed an internal complaint with Penelec's human resources department raising an assortment of claims. (Doc. 30 ¶ 44; Doc. 37 ¶ 44). Hileman contended that she suffered race and gender discrimination on four occasions: *first*, when Robbie Spencer ("Spencer"), a Caucasian woman, received a raise to Hileman's pay rate without receiving proper training; *second*, when Penelec

disciplined Hileman for changing a timesheet to reflect paid sick leave instead of unpaid sick leave; *third*, when management failed to remove a "sexually oriented" calendar posted by male employees; and *fourth*, when management failed to post a "hybrid position" or authorize increased pay rates for utility workers performing operating clerk duties (a reprise of the 2008 PHRC complaint). (Doc. 30 ¶ 44; Doc. 37 ¶ 44). The record is vague as to whether or how the internal complaint resolved. Except for the dispute appertaining operating clerk duties, Hileman did not pursue this complaint with the PHRC or EEOC. (Doc. 30 ¶ 53; Doc. 37 ¶ 53).

### B.    Hileman's Termination

Throughout the course of her employment, Hileman worked in the same office area as Spencer, who was employed as a utility worker-floater, and Lea Ann Wray ("Wray"), a Caucasian woman employed as a customer service clerk. (Doc. 30 ¶ 5; Doc. 37 ¶ 5). The office space included a radio which connected to the facility's public announcement system. (Doc. 30 ¶ 54; Doc. 37 ¶ 54).

On December 2, 2010, Hileman returned to her desk after lunch and was preparing to take medication with a cup of juice. (<u>See</u> Doc. 30 ¶¶ 56, 62; Doc. 37 ¶¶ 56, 62). When Hileman arrived at her desk, she discovered that the radio had been turned off. (Doc. 30 ¶ 56; Doc. 37 ¶ 56). Hileman asked Spencer why the radio was off, and Spencer said that Bolinger (their mutual supervisor) turned it off to concentrate on his work. (Doc. 30 ¶ 57; Doc. 37 ¶ 57). Spencer added that she too had difficulty concentrating with the radio turned on. (Doc. 30 ¶ 58; Doc. 37 ¶ 58). Hileman rejoined by suggesting that Spencer and other employees disturbed her concentration by "carrying on" and "laughing loud" in the shared office space.

4

(Doc. 30 ¶ 59; Doc. 37 ¶ 59). Wray joined the conversation and concurred with Spencer's opinion. (Doc. 30 ¶ 60; Doc. 37 ¶ 60). Bolinger witnessed the dispute unfold from his office doorway. (Doc. 37 ¶ 60).

Hileman attempted to deescalate the situation by walking away. (Doc. 30 ¶ 61; Doc. 37 ¶ 61). Wray then taunted Hileman, stating "you think you can just walk away from everything" as Hileman walked off. (Doc. 30 ¶ 61; Doc. 37 ¶ 61). The parties dispute what transpired next. According to defendants, Hileman turned around and "threw her cup of juice all over Spencer." (Doc. 30 ¶ 63). Hileman denies throwing the cup "directly at Spencer." (Doc. 37 ¶ 63). She insists that she threw the cup toward the floor and that the juice "splattered up and onto Spencer." (Id.) In any event, the parties agree that juice ended up on Spencer. (Doc. 30 ¶ 63; Doc. 37 ¶ 63; see Docs. 31-19 to -21). Spencer shouted that she had been "assaulted" by Hileman, and Bolinger intervened before the situation could further devolve. (Doc. 30 ¶¶ 64-65; Doc. 37 ¶¶ 64-65). Bolinger, Hileman, Spencer, and Wray each drafted written statements describing the incident before Bolinger dismissed Hileman for the day. (Doc. 30 ¶¶ 66-67; Doc. 37 ¶¶ 66-67). Spencer thereafter informed Bolinger that she feared for her "personal safety" as a result of the altercation. (Doc. 30 ¶ 68; Doc. 37 ¶ 68).

Bolinger and a representative from the Local 180 interviewed Hileman concerning the incident the following day. (Doc. 30 ¶ 69; Doc. 37 ¶ 69). Randy Parson ("Parson"), Bolinger's supervisor and manager of the Huntingdon facility, also participated in the interview. (Doc. 30 ¶ 69; Doc. 37 ¶ 69). Hileman expressed that she became anxious during her conversation with Wray and Spencer and that

she reached a "breaking point." (Doc. 30 ¶ 69; Doc. 37 ¶ 69). Penelec suspended Hileman without pay pending the results of its internal investigation. (See Doc. 30 ¶ 72; Doc. 37 ¶ 72). By letter dated December 9, 2010, Parson advised Hileman of defendants' decision to terminate her employment effective immediately. (Doc. 30 ¶ 75; Doc. 37 ¶ 75). In his letter, Parson cited Penelec's workplace violence policy as the basis for Hileman's termination. (See Doc. 30 ¶ 75; Doc. 37 ¶ 75). That policy broadly proscribes violence by Penelec employees. (Doc. 31-27 at 20). Parson's letter also cited a workplace safety meeting Hileman attended two weeks prior to the altercation.[3] (Doc. 30 ¶ 75; Doc. 37 ¶ 75).

Hileman filed a grievance with the Local 180 contesting her termination. (Doc. 30 ¶ 77; Doc. 37 ¶ 77). Hileman also dual-filed a complaint with the PHRA and EEOC on May 10, 2011, claiming discriminatory and retaliatory discharge. (Doc. 30 ¶ 78; Doc. 37 ¶ 78; see Doc. 31-31 ¶ 44). Hileman's grievance thereafter proceeded to arbitration. (Doc. 30 ¶ 79; Doc. 37 ¶ 79). In a written decision issued February 20, 2012, the arbitrator sustained Hileman's grievance in part. (See Doc. 30 ¶ 81; Doc. 37 ¶ 81). Specifically, the arbitrator reinstated Hileman's employment, but found that she was not entitled to back pay because of the seriousness of her misconduct. (Doc. 30 ¶¶ 81-82; Doc. 37 ¶¶ 81-82). The arbitrator also found that Hileman was an

---

[3] Hileman was also criminally charged with harassment as a result of her altercation with Spencer. (Doc. 30 ¶ 76; Doc. 37 ¶ 76). A magistrate judge found Hileman guilty on February 4, 2011. (Doc. 30 ¶ 76; Doc. 37 ¶ 76). On appeal, the court dismissed the charge and ordered Hileman's record to be expunged. (See Doc. 37 ¶ 76; Doc. 37-31 at 3).

"unknowing target" who had been "ganged up on" by her coworkers. (Doc. 31-32 at 20).

### C.    Hileman's Reinstatement

Penelec reinstated Hileman's employment on March 5, 2012. (Doc. 30 ¶ 89; Doc. 37 ¶ 89). Hileman returned to work on March 12, 2012. (Doc. 30 ¶ 89; Doc. 37 ¶ 89). Bolinger, Parson, and regional manager Sally Simmons ("Simmons"), decided to conduct workplace violence training on the day Hileman returned to work. (Doc. 30 ¶ 87; see also Doc. 37 ¶ 87). Management intended the training, at least in part, to address Hileman's altercation with Spencer. (Doc. 30 ¶ 88; see also Doc. 37 ¶ 88).

Penelec hired a new utility worker-floater, Vicki Kauffman ("Kauffman"), during Hileman's year-plus absence. (See Doc. 30 ¶ 98; Doc. 37 ¶ 98). Management assigned Hileman's then-vacant workspace to Kauffman. (See Doc. 30 ¶ 98; Doc. 37 ¶ 98). Prior to Hileman's return, Bolinger, Parson, and Simmons discussed where to locate Hileman's new workspace to ensure that both she and Spencer would be "comfortable." (Doc. 30 ¶ 101; see also Doc. 37 ¶ 101). They chose to assign Hileman to a workspace located between Bolinger's and Wray's offices. (Doc. 30 ¶ 101; see Doc. 37 ¶ 101). Hileman's new office space was separated from the reception area where she previously worked by "a few steps and . . . a doorway." (Doc. 30 ¶ 102; see, e.g., Doc. 31-35 at 1). Hileman found the new space to be "a cluttered mess," likening it to a "storage closet" rather than an office. (Doc. 37 ¶¶ 101-02).

The new workspace at first did not contain a computer or the requisite internet connection to support Hileman's job duties. (See Doc. 30 ¶¶ 107-08; Doc. 37

¶¶ 107-08).  Bolinger requested a computer hook-up for Hileman, and, once alerted to the issue, Simmons assigned an employee to resolve Hileman's computer issues as soon as possible.  (Doc. 30 ¶¶ 111-12; Doc. 37 ¶¶ 111-12).  While Hileman waited for a computer system in her new workspace, she used a computer in a storeroom office near the facility's garage.  (See Doc. 30 ¶¶ 114-15; Doc. 37 ¶¶ 114-15).  The room had no air conditioning and poor ventilation.  (Doc. 30 ¶ 116; Doc. 37 ¶ 116).  Kauffman eventually left the Huntingdon facility, and Hileman asked to relocate to her former desk.  (Doc. 30 ¶¶ 120-21; Doc. 37 ¶¶ 120-21).  Bolinger denied Hileman's request, citing the proximity of her old workspace to Spencer's desk.  (Doc. 30 ¶ 121; Doc. 37 ¶ 121).  When Hileman complained of rising temperatures in the storeroom office, Bolinger moved the computer from that office to Hileman's new workspace. (Doc. 30 ¶ 117; Doc. 37 ¶ 117).

In April of 2012, Bolinger asked Hileman to work three shifts at Penelec's Lewistown facility to cover for a utility worker on sick leave.  (Doc. 30 ¶ 122; Doc. 37 ¶ 122).  Spencer, a utility worker-floater, covered an additional 19 shifts.  (Doc. 30 ¶ 127; Doc. 37 ¶ 127).  Bolinger testified that he assigned employees to cover the shifts based on availability and qualifications.  (Doc. 30 ¶¶ 131-32; Doc. 37 ¶¶ 131-32). Kauffman lived nearest to the Lewistown facility at the time, but Bolinger did not assign shifts to her because, as a new hire, she was not qualified to perform the work.  (See Doc. 30 ¶ 132; Doc. 37-55 at 2).  Bolinger stopped assigning Hileman to Lewistown shifts after she complained about the assignments to the Local 180. (Doc. 30 ¶ 129; Doc. 37 ¶¶ 122, 129).

Hileman also sought a pay increase for certain work performed after her reinstatement. At that time, both Hileman and Spencer shared duties for a vacant district storekeeper position. (Doc. 30 ¶¶ 133-34; Doc. 37 ¶¶ 133-34). Hileman and Spencer believed they should have been paid at the higher storekeeper rate when performing these duties. (Doc. 30 ¶ 135; Doc. 37 ¶ 135). When Penelec denied their requests for a pay increase, Hileman and Spencer filed grievances with the Local 180. (Doc. 30 ¶¶ 136-37; Doc. 37 ¶¶ 136-37). The union declined to pursue the grievances, finding that Hileman's and Spencer's job descriptions (and thus their pay rates) included the storekeeper duties they performed. (Doc. 30 ¶¶ 138-39; Doc. 37 ¶¶ 138-39).

Hileman did not receive any negative performance reviews or discipline following her reinstatement. (Doc. 30 ¶ 118; Doc. 37 ¶ 118). She continued working at the Huntingdon facility until its closure in November of 2012. (Doc. 30 ¶ 118; Doc. 37 ¶ 118). From 2009 until the facility closed, Hileman and Spencer received equal pay at the maximum hourly rate available. (Doc. 30 ¶ 141; Doc. 37 ¶ 141).

Hileman commenced this action on September 11, 2014. (Doc. 1). In her three-count complaint, Hileman asserts claims for race discrimination (Count I), gender discrimination (Count II), and retaliation (Count III) under Title VII. (Id.) Defendants move for summary judgment as to each claim. (Doc. 29). The motion is fully briefed (Docs. 32, 36, 40) and ripe for disposition.

## II.  <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial

would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## III. Discussion

Defendants contend that the record does not support Hileman's Title VII discrimination or retaliation claims. They argue *first*, that Hileman cannot establish a *prima facie* case of discrimination or retaliation; *second*, that any adverse employment action was substantiated by a legitimate, non-discriminatory rationale; and *third*, that Hileman cannot demonstrate that such rationale is pretextual.[4] We begin our analysis with Hileman's discrimination claims.

### A. Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or

---

[4] Defendants also ask the court to dismiss FirstEnergy as a defendant because Hileman adduces no evidence to justify piercing the corporate veil. (Doc. 32 at 48-50; see also Doc. 36 at 46-48). In light of our merits analysis *infra*, we need not address this separate issue.

privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The familiar burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), governs discrimination claims under Title VII.

The first prong of the <u>McDonnell Douglas</u> inquiry tasks a plaintiff to establish a *prima facie* case of discrimination. <u>See</u> <u>Burton v. Teleflex Inc.</u>, 707 F.3d 417, 426 (3d Cir. 2013) (quoting <u>Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.</u>, 407 F.3d 535, 538 (3d Cir. 2006)). To do so, a plaintiff must prove: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of discrimination. <u>Kimes v. Univ. of Scranton</u>, 126 F. Supp. 3d 477, 494 (M.D. Pa. 2015) (citing <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410-11 (3d Cir. 1999)). If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate one or more legitimate, nondiscriminatory rationales for its decision. <u>See</u> <u>Goosby v. Johnson & Johnson Med., Inc.</u>, 228 F.3d 313, 319 (3d Cir. 2000) (citing <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254-56 (1981)). An employer's obligation in this regard is "relatively light." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). If the employer meets this minimal burden of production, the ultimate burden returns to the plaintiff to show that the proffered rationale is pretextual. <u>See</u> <u>Goosby</u>, 228 F.3d at 319 (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000)).

### 1.    Prima Facie *Case: Termination*

Hileman first claims that her termination in December of 2010 was animated by discriminatory motive.  (See Doc. 1 ¶¶ 33-38, 44-48).  Defendants contend that Hileman has not proven that she was qualified for the utility worker position and that she fails to raise an inference of discrimination.  (Doc. 32 at 9 n.2).

We reject defendants' inceptive assertion that Hileman's altercation with Spencer rendered her unqualified for her position.  (See id.)  The qualification requirement concerns only "the bare minimum requirement to perform the job at issue."  Makky v. Chertoff, 541 F.3d 205, 215 (3d Cir. 2008).  Defendants concede that, upon reinstatement, Hileman performed her job duties and did not receive a negative performance review or reprimand.  (Doc. 30 ¶ 118).  Defendants have not shown that Hileman lacks the minimum qualifications to perform her job.

Defendants' principal contention is that the *probata* does not permit an inference of discriminatory intent.  (Doc. 32 at 9 n.2).  A plaintiff may discharge her burden in this regard by producing "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion."  Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 356 (3d Cir. 1999) (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996)).  One way to raise such an inference is through "comparator" evidence—proof that the employer treated similarly-situated individuals outside of the protected class more favorably.  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998) (citing Fuentes, 32 F.3d at 765).  A comparator is "similarly situated" when his or her conduct was "of comparable seriousness" to the plaintiff's.  Glenn v. Raymour & Flanigan, 832 F. Supp. 2d 539,

12

548 (E.D. Pa. 2011) (citation omitted).  In the employee discipline context, relevant considerations include whether the employees shared a supervisor, were subject to the same or similar performance standards, and engaged in the same or similar conduct without differentiating or mitigating factors.  Terrell v. City of Harrisburg Police Dep't, 549 F. Supp. 2d 671, 681 (M.D. Pa. 2008) (Conner, J.) (citation omitted).  The parties *sub judice* address comparators in their pretext analyses, but courts regularly explore the issue as part of the *prima facie* case.  See, e.g., id.; see also Foye v. SEPTA, No. 15-1036, 2017 WL 1150259, at *6 (E.D. Pa. Mar. 28, 2017) (collecting cases).

Discovery revealed four potential comparators: Steve Walker ("Walker"), Gary Hileman (Hileman's brother-in-law), Adam George ("George"), and Thomas Dubbs ("Dubbs").[5]  (Doc. 30 ¶¶ 146-61; Doc. 37 ¶¶ 146-61).  Hileman alleges that each of these four employees—all Caucasian males—engaged in "much more severe and violent altercations" than her own.  (Doc. 1 ¶¶ 44-46; see also id. ¶ 33).  She testified that Walker and Gary Hileman engaged in a physical fight "after work hours and off of [c]ompany property," and that Penelec did not fire either employee as a result.  (Doc. 130 ¶ 150; Doc. 137 ¶ 150).  Another employee claimed to have reported the

---

[5] Hileman confoundingly asserts that defendants "failed to provide evidence of comparators" and intimates that the "lack of comparators" is itself indicative of discrimination.  (Doc. 36 at 19-20).  Hileman claims that because the defendants "fail to harshly discipline or terminate anyone," no comparator exists.  (Id. at 19).  As a threshold matter, it is Hileman and not her employer who bears the burden of proving disparate treatment among similarly-situated employees.  Further, a careful reading of Hileman's papers makes clear that Hileman disputes not the existence of comparators, but whether defendants' treatment of those individuals permits an inference of discrimination.  (Id. at 19-20; see also Doc. 1 ¶¶ 33-34, 44-46).

fight to management, but Bolinger denied ever learning of the incident and neither Walker nor Gary Hileman reported it to Penelec. (Doc. 130 ¶¶ 153-55 & n.10; Doc. 137 ¶¶ 153-55). Hileman also alleges that George, a layout technician, was not fired after stating he would "blow management away" during a safety meeting, and that Dubbs, an operating clerk who retired more than 30 years ago, was not fired after he "punched another employee." (Doc. 130 ¶¶ 146-49; Doc. 137 ¶¶ 146-49). Hileman offers no additional elucidation of these prior incidents.

We cannot distill an inference of discrimination from Penelec's treatment of the purported comparators. The alleged fight between Walker and Gary Hileman occurred outside of work hours, away from Penelec property, and without the direct knowledge of Penelec management. (See Doc. 130 ¶¶ 150, 154-55; Doc. 137 ¶¶ 150, 154-55). The incident stands in stark contrast to Hileman's workplace altercation with Spencer, which occurred on company property and time, and in *direct view* of Hileman's supervisor. (See Doc. 130 ¶ 63; Doc. 137 ¶¶ 63-64). Likewise, George's *verbal* remark during a meeting—which Hileman agrees may have been in jest—is materially distinct from a *physical* altercation. (See Doc. 130 ¶ 148; Doc. 137 ¶ 148). Regarding Dubbs, Hileman fails to establish the circumstances of his alleged fight. She does not know whether the fight occurred on company property or elsewhere, nor does she indicate to whom Dubbs reported or whether he was subject to a zero-tolerance workplace violence policy as she was. (See Doc. 31-1, Hileman Dep. 159:8-161:15, June 10, 2016). Hileman has not shown that defendants treated a similarly-situated individual outside of her protected class more favorably.

Hileman also intimates that the circumstances of her termination raise an inference of discrimination. She specifically avers that management's response to the altercation with Spencer was exaggerated and insists that this alone supports her discrimination claim. (See Doc. 36 at 18-19). Hileman adduces no evidence suggesting that discriminatory animus tainted defendants' decision to terminate her employment. Hileman remonstrates that Penelec fosters "a corporate culture unfavorable to women and people of color," (id. at 21), but her *allegata* are at fatal variance with the *probata*. The Rule 56 record does not permit an inference that improper motives inspired Hileman's termination. Hileman accordingly fails to make out a *prima facie* case of Title VII discrimination as pertains her termination.[6]

### 2. Prima Facie *Case: Post-Reinstatement*

Hileman avers that defendants continued to discriminate against her after her reinstatement. (Doc. 36 at 21-39). Hileman identifies four perceived adverse

---

[6] Assuming *arguendo* that Hileman could establish a *prima facie* case, defendants have articulated a legitimate, nondiscriminatory rationale for her termination: her physical altercation with a coworker in violation of the workplace violence policy. This proffer satisfies defendants' burden of production and shifts the burden of proof to Hileman to establish pretext. To discredit defendants' rationale as pretext, Hileman must identify "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in defendants' proffered explanations that "a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 762 (emphasis and internal quotation marks omitted). It is not enough for Hileman to oppugn defendants' business judgment; she must prove that defendants' proffered rationale is "not merely . . . wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." James v. Tri-Way Metalworkers, Inc., 189 F. Supp. 3d 422, 435 (M.D. Pa. 2016) (quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997)). Hileman's pretext argument mirrors the contentions rejected by the court *ante*, to wit: disparate treatment of prospective comparators and a subjective belief that defendants foster a discriminatory culture. Hence, Hileman cannot carry her burden at step three of the McDonnell Douglas framework.

employment actions: (1) workplace violence training on the day of her return; (2) her reassignment to a new workspace; (3) Bolinger's request that Hileman cover three shifts at a different facility; and (4) Penelec's refusal to upgrade her pay for performing storekeeper duties. (See Doc. 36 at 25, 27-33).[7] Defendants contend that none of the cited actions are "adverse employment actions" sufficient to prove a *prima facie* case of discrimination. (Doc. 32 at 9 n.2).

An "adverse employment action" under Title VII is one which is sufficiently tangible to effect a "significant change" to an employee's status. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761-62 (1998). Such actions include hiring, firing, and failing to promote, as well as reassignment of material responsibilities or significant changes in benefits. Id.; Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)). An adverse employment action usually causes "direct economic harm." Ellerth, 524 U.S. at 762.

Most of the conduct cited by Hileman does not fit this bill. Hileman claims that she was embarrassed by the workplace violence training on the day of her return and inconvenienced by her new office space. (Doc. 37 ¶¶ 88, 101). But she identifies no objective harm stemming from the circumstances of her reinstatement that amounts to a "significant change" in her employee status. See Ellerth, 524 U.S.

---

[7] In her opposition brief, Hileman indicates that she suffered "more" adverse employment actions than those explored in the Rule 56 briefing. (See Doc. 36 at 9). Hileman offers neither evidence nor argument to substantiate any additional claim. Consequently, we deem any claim regarding actions beyond those discussed herein to be waived. See Brice v. City of York, 528 F. Supp. 2d 504, 516 n.19 (M.D. Pa. 2007) (Conner, J.) (citing D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999)); Brown v. Pa. State Dep't of Health, 514 F. Supp. 2d 675, 678 n.7 (M.D. Pa. 2007) (same).

at 761-62.  Hileman describes the coverage assignments in Lewistown as "illogical," but again fails to identify an attendant disadvantage or injury.  (See Doc. 37 ¶¶ 122-23).  None of these actions resulted in a significant change in compensation or in the terms and circumstances of Hileman's employment.  Hence, they cannot serve as the basis for a Title VII discrimination claim.  Defendants are entitled to summary judgment on these aspects of Hileman's discrimination claim.

Hileman's claim concerning a denied pay upgrade fares no better, but for a different reason.  Defendants' refusal to increase Hileman's pay rate is arguably an economic harm constituting adverse employment action.  However, Hileman must also prove that the refusal occurred under circumstances inferring discrimination.  Pivirotto, 191 F.3d at 356 (quoting O'Connor, 517 U.S. at 312).  Hileman asseverates that defendants' decision must have been premised on gender animus because two female employees (Hileman and Spencer) were denied an upgrade, (see Doc. 36 at 38), but she offers no proof to substantiate this allegation.  No evidence indicates, for example, that male employees received a pay upgrade, nor does the record *in toto* imply that gender bias played a role in defendants' decision.  *Per contra*, the evidence shows unequivocally that defendants based their denial on the terms of the collective bargaining agreement.  (Doc. 30 ¶¶ 136-39; Doc. 37 ¶¶ 136-39).

Hileman cannot establish a *prima facie* case of discrimination with regard to her termination or any post-reinstatement actions.  She offers much conjecture, but her speculation and suspicion are not enough to survive Rule 56 scrutiny.  See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams

v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)).  We will grant summary judgment to defendants on Hileman's race and gender discrimination claims.

### B.    Retaliation

Hileman asserts that each of the employment actions described *supra* sustain her separate claim for unlawful retaliation.  Title VII protects employees who have "opposed any practice made an unlawful employment practice" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute.  42 U.S.C. § 2000e-3(a).  We analyze retaliation claims pursuant to the McDonnell Douglas framework.  See Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 257 (3d Cir. 2017) (citing Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006)).

To establish a *prima facie* case of retaliation, a plaintiff must prove that: (1) she engaged in protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal nexus between the protected activity and the adverse action.  See id.  As in discrimination cases, once a plaintiff makes out a *prima facie* case, the burden shifts to the employer to proffer legitimate, non-retaliatory reasons for its decision.  Id.  If it does, the burden of persuasion returns to the plaintiff to prove that the proffered non-retaliatory rationale is pretextual and that unlawful motive was the "but-for" cause of the adverse action.  See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. __, 133 S. Ct. 2517, 2533 (2013); Carvalho-Grevious, 851 F.3d at 257.  We consider first whether the record evinces a *prima facie* case of retaliation.

Hileman engaged in protected activity with respect to her formal complaints to the PHRC on July 8, 2008 and May 10, 2011, as well as her internal complaint to human resources on February 10, 2010. (See Doc. 30 ¶¶ 39, 44, 78; Doc. 37 ¶¶ 39, 44, 78). Defendants concede this point. (Doc. 32 at 42-43 & n.5). They dispute only the second and third elements of Hileman's *prima facie* case. (Id. at 41-45).

### 1. Prima Facie *Case: Adverse Employment Actions*

Defendants first claim that courts measure "adverse employment actions" anent retaliation and discrimination claims against identical rubrics. (Id. at 41-42). The Supreme Court expressly rejected this *in pari materia* interpretation of Title VII's retaliation and discrimination language more than a decade ago in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 61-64 (2006). Therein, the Court explored the respective purposes of the neighboring statutory provisions and held that a standard which "speaks in general terms" rather than in terms of enumerated acts best fosters the goals of the anti-retaliation provision. Id. at 69 (citation omitted). Thus, employer conduct is actionable when it is "materially adverse," a phrase defined broadly to include any act which might "dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" Id. at 68 (citation omitted). The standard is an objective one and is designed to "separate significant from trivial harms." Id.

Hileman plainly suffered adverse employment action when defendants terminated her employment and refused to upgrade her rate of pay. See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007); (see also Doc. 32 at 41-42). A reasonable employee might well (and indeed, would likely) perceive

termination and denied pay increases as a deterrent to protected activity. <u>White</u>, 548 U.S. at 72-73. Both termination and a denied pay upgrade are potentially actionable adverse employment decisions.

We evaluate the balance of the alleged adverse actions in view of all attendant circumstances and from the perspective of a "reasonable person in plaintiff's position." <u>Id.</u> at 71 (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998)). In this regard, "petty slights" and "minor annoyances" will not ordinarily equate to materially adverse conduct. <u>Id.</u> at 68. But the context of such actions matters, and employer conduct which at first blush appears *de minimis* may be significant in context. <u>See</u> <u>id.</u> For example, failure to invite an employee to lunch is "normally trivial," but the slight may be material if the lunch is a valuable weekly training event that contributes to professional development. <u>Id.</u> We must consider the totality of the circumstances in determining whether the remainder of defendants' challenged actions were "materially adverse." <u>See</u> <u>id.</u>

Hileman avers that she felt humiliated when defendants scheduled a workplace safety training on her first day back at work. (Doc. 37 ¶ 88). Defendants required *all* employees at the Huntingdon facility to attend this training. (Doc. 30 ¶¶ 90-92; Doc. 37 ¶¶ 90-92). The record is devoid of evidence that management endeavored to personally victimize or target Hileman during the training program. (<u>See</u> Doc. 37 ¶¶ 90-92). Moreover, Hileman does not discredit defendants' assertion that management was genuinely concerned for workplace safety. Under these circumstances, the court cannot conclude that requiring Hileman to attend a training mandated for all employees is an adverse employment action.

Hileman also cites the relocation of her workspace as retaliatory conduct. She challenges defendants' decision to relocate her to the "back office," away from Spencer and the reception area where she previously worked, and takes issue with the condition of the new workspace. (See Doc. 36 at 25, 28). Hileman avers that the new space was "a cluttered mess" and that defendants should have "straightened up the area" for her. (Doc. 37 ¶¶ 89, 101-02). Hileman emphasizes that the space initially lacked a computer setup, forcing her to use a computer in a "dirty" garage office lacking climate control. (Id. ¶¶ 115-16).

The evidence wholly refutes Hileman's depiction of these issues. The "back office" to which Hileman was reassigned is separated only by steps and a doorway from her former desk. (See Doc. 30 ¶ 102; Doc. 31-35 at 1). Hileman concedes that she *voluntarily* utilized the garage office of which she now complains prior to her termination. (Doc. 30 ¶ 114; Doc. 37 ¶ 114). And she ignores that the bulk of the inconveniences she cites were temporary, while defendants worked "as fast as possible" to ensure functionality of her new workspace. (See Doc. 30 ¶¶ 107-17). The record reflects that defendants accommodated Hileman in the only office space available upon her return, (id. ¶¶ 98-99; Doc. 37 ¶¶ 98-99), and appropriately chose not to reassign her to workspace in the immediate vicinity of Spencer in the interest of workplace safety. (Doc. 30 ¶ 101). The relocation of Hileman's workspace is not a materially adverse employment action.

Similarly, Bolinger's request that Hileman cover three shifts at Penelec's Lewistown facility does not amount to adverse employment action. (Doc. 36 at 25, 28). Bolinger asked Spencer to cover 19 shifts at the Lewistown facility compared

to Hileman's three, and he explained that he based his requests on availability and qualifications. (Doc. 30 ¶¶ 131-32; Doc. 37 ¶¶ 131-32). Bolinger stopped asking Hileman to cover these shifts when she complained about them to the union. (Doc. 30 ¶ 129; Doc. 37 ¶¶ 122, 129). Hileman neither claims nor substantiates a derivative injury from the request that she cover three shifts at a separate location. These requests are not actionable. Accordingly, the balance of our analysis concerns only two adverse employment actions: Hileman's termination, and defendants' denial of her request for a pay rate upgrade.

### 2. Prima Facie *Case: Causation*

A plaintiff satisfies the third prong of her *prima facie* case by adducing evidence to demonstrate a causal link between her protected activity and the adverse employment actions she suffered. Moore, 461 F.3d at 340-41 (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). A causal link may be shown by evidence of an "unusually suggestive" temporal proximity between the protected activity and the adverse action. LeBoon, 503 F.3d at 232 (citing Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)). When temporal proximity is not patently suggestive, plaintiffs may raise an inference of causation by pointing to evidence of intervening antagonistic conduct or animus, inconsistencies in the employer's rationale, or other record evidence which implies retaliatory motive. See LeBoon, 503 F.3d at 232 (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000)). Any evidence "gleaned from the record as a whole" may support this showing. Farrell, 206 F.3d at 281.

Hileman does not point the court to any specific evidence germane to her Title VII protected activities. She relies almost exclusively on temporal proximity to impute causation. (See Doc. 36 at 37). Hileman engaged in three discrete protected activities: on July 8, 2008, she filed a formal complaint with the PHRC; on February 10, 2010, she filed an internal complaint with Penelec's human resources office; and on May 10, 2011, she again filed a formal complaint with the PHRC. (Doc. 30 ¶¶ 39, 44, 78; Doc. 37 ¶¶ 39, 44, 78; see also Doc. 32 at 42-43 & n.5).

Unusually suggestive temporal proximity is typically measured in terms of days and weeks. Compare Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 198 (3d Cir. 2015) (ten months insufficient); LeBoon, 503 F.3d at 233 (three months insufficient), with Jalil, 873 F.2d at 708 (two days sufficient). Hileman's termination postdated her 2008 complaint by more than two years, and her 2010 complaint by nearly ten months. (See Doc. 30 ¶¶ 39, 44, 75; Doc. 37 ¶¶ 39, 44, 75). Neither party identifies precisely when Penelec denied Hileman's request for a pay upgrade, but the record shows that the union declined to pursue her upgrade grievance in February of 2013, almost two years after the 2010 complaint. (See Doc. 31-14). On these facts, timing alone does not permit an inference of retaliation.

Hileman asserts cursorily that a "pattern of antagonism" combines with timing to substantiate an inference of retaliatory motive. (Doc. 36 at 37). As noted supra, when timing alone is not overtly suggestive, a plaintiff may point to evidence of intervening antagonism to support her prima facie case. See LeBoon, 503 F.3d at 232 (quoting Farrell, 206 F.3d at 279-81). We must examine all intervening conduct collectively to assess whether circumstances connote retaliation. See Marra, 497

23

F.3d at 303. Acts of antagonism need not rise to the level of adverse employment actions to bespeak retaliatory motive. See, e.g., id. at 303-05.

Hileman identifies one instance of antagonistic conduct in the months following her reinstatement: a remark made by one coworker to another to the effect that Hileman's new workspace assignment placed the "black in the back." (Doc. 37 ¶¶ 105, 142-43). Odious though it may be, this remark fails to support Hileman's claim. Hileman was not present when the remark was uttered, nor does she identify the speaker or the context in which it was made. (See id.) Thus, the statement is inadmissible hearsay. See FED. R. EVID. 802. Moreover, the purported remark does not accurately depict Hileman's new office arrangement: undisputed evidence establishes that Hileman shared her new workspace with two Caucasian employees. (See Doc. 30 ¶¶ 4-5, 101; Doc. 37 ¶¶ 4-5, 101).

The remark also cannot satisfy Hileman's burden under prevailing law. The Third Circuit Court of Appeals consistently reaffirms that "[s]tray remarks by non-decisionmakers . . . unrelated to the decision process" will "rarely" suffice to prove retaliation. Pivirotto, 191 F.3d at 359 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)). This is especially true when the comment is temporally remote from the adverse action. Id. Hileman does not acknowledge this principle, and she offers the court no basis to deviate from it. The unidentified coworker's remark could not, without more, support a verdict in Hileman's favor.

Hileman fails to raise an inference of retaliatory motive through timing, inconsistent testimony, a pattern of antagonism, or other circumstantial evidence. The summary judgment record simply does not establish a causal relationship

24

between Hileman's protected activities and defendants' employment decisions.

Hence, Hileman cannot establish a *prima facie* case of retaliation under Title VII.[8]

We will grant summary judgment to defendants on Hileman's retaliation claim.

**IV.**     **Conclusion**

For all of the reasons stated herein, the court will grant defendants' motion

(Doc. 29) for summary judgment.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     June 27, 2017

---

[8] Assuming *arguendo* that the record allowed an inference of causation, it would not satisfy Hileman's burden of persuasion.  Hileman must prove at step three of the McDonnell Douglas framework that her protected activity was the *but-for cause* of her termination and the denied pay upgrade.  See Nassar, 133 S. Ct. at 2533.  Hileman could not achieve this ultimate burden: the evidence unequivocally establishes that Hileman's termination was the result of a contentious altercation with a coworker on company property, and that defendants denied her pay upgrade at the recommendation of union counsel, based on the language of the collective bargaining agreement.